## JOHNSON v. FULLER et al.

No. 1268.

District Court, E. D. Pennsylvania.

Dec. 30, 1940.

Seymour M. Heilbron, of Philadelphia, Pa., and Arthur Garfield Hays, of New York City, for plaintiff.

Evans, Bayard & Frick, Charles E. Kenworthey, Francis H. Scheetz, and Robert Gibbon, all of Philadelphia, Pa., for defendants in error.

GANEY, District Judge.

This bill was brought by Norman Johnson, a preferred stockholder of the Curtis Publishing Company, suing on behalf of himself and all other stockholders of the Company similarly situated, against the Curtis Publishing Company and Walter D. Fuller, et al., asking (1) for the enjoining and restraining of the defendant, the Curtis Publishing Company, its officers and directors, from paying or declaring any dividends on said company's prior preferred stock and paying any interest on or retiring any of said company's fifteen-year debentures, so long as any shares of said company's preferred stock remain outstanding in the hands of the public; (2) that a decree be made declaring the issuance of the prior preferred stock, the fifteen-year debentures and the common stock under the alleged plan of reorganization and recapitalization to be contrary to law and to be null and void or that the defendants, Walter D. Fuller et al., and each of them be required to account to the defendant, the Curtis Publishing Company, and to pay to the said company all monies and assets of the company which have been dissipated and wasted, and to pay to the said the Curtis Publishing Company the full consideration for the issuance of said prior preferred stock, debentures and the common stock an amount which would preserve the privileges and preferences of the plaintiff as a preferred stockholder and of other preferred stockholders similarly situated.

The plaintiff, Norman Johnson, owns one hundred shares of the preferred stock of the Curtis Publishing Company for which he paid $4,592 in February, 1940. As of December 31, 1939, the capital structure of the Curtis Publishing Company consisted of 900,000 shares of preferred stock, without a par value; 736,373 of which was held by the public and 177,580 of which were held by the company; 1,800,000 shares of common stock without par value of which 1,733,041 were held by the public and 66,959 held by the company. The preferred stock was a $7 per share cumulative dividend stock and had priority over common as to dividends and all accumulations thereon and on liquidation to be paid $100 per share and which was callable at $120 per share. The "contingent reserve and undivided profit" of the defendant company or what is ordinarily designated as earned surplus as of the above date amounted to about $20,000,000.

Also as of the above date the company had a cash position of $8,690,442.39 and marketable securities on the basis of costs less reserve for amortization of bond premiums of $9,201,393.35.

During the years 1926 and 1932, inclusive, the Company's net income ranged between a high of $21,534,265 in 1928 and a low of $5,567,905 in 1932. Dividends in full on the $7 preferred stock and dividends on the common stock were paid up to and including 1932. For the years 1933 to 1939, inclusive, the company's net income ranged between a high of $6,291,453 in 1936 and a low of $1,279,163 in 1938. The annual dividend requirement on the $7 preferred stock consisting of 722,420 shares required annually approximately $5,000,000, and taking the average net income for the eight year period previous to 1940 there was a net income of approximately $4,000,000 or $1,000,000 less than the annual dividend requirement on the preferred shares. Dividends on the common stock were stopped in 1932. The year 1933 marked the first year in which the full dividend of $7 was not paid, as the net income that year was only $1,313,576 and that year accordingly marked the beginning of the accumulation on the preferred stock, so that on December 31, 1939, the accumulation on the preferred stock amounted to $16.87½ per share. However, during the year 1933 to 1939, inclusive, that is, beginning with the first of the years during which full dividends were not paid on the preferred stock, the company earned a total of $26,630,322 and paid out in dividends on the preferred stock $27,337,519.31. Thus it will be seen while of course the company did not pay the full dividend every year, it paid out all that it earned during those years and a little bit more, on the preferred stock, and therefore it would seem to follow that "the contingent reserve and undivided profits", or what is here designated as the surplus, which was as of December 31, 1939, about $20,000,000 could not have been built up from the net earnings of the company for these years. Accordingly, it is seen that beginning with the year 1933, the earnings of the corporation were insufficient to pay the dividends on the preferred stock and the accumulated dividends thereon which as of December 31, 1939, amounted to $16.87½ and during all these years nothing was paid on the common stock.

On December 16, 1925, at a meeting of the stockholders of the Curtis Publishing

Company, a resolution was passed, the pertinent parts of which are as follows:

"Resolved, That the Company issue 900,000 shares no par value cumulative Preferred Stock, subject to the following rights, privileges, preferences, terms and conditions:

"Holders of Preferred Stock shall be entitled to receive cumulative dividends thereon at the rate of $7. per share per annum, and no more, payable out of the surplus profits of the corporation quarterly on the first days of January, April, July and October in each year, before any dividends shall be paid or set apart upon the Common Stock of the Company.

"The whole or any part of said Preferred Stock at any time outstanding, may be redeemed by the corporation at its option at any dividend date, at $120. per share and all accumulated unpaid and accrued dividends thereon * * *.

"So long as any of the Preferred Stock remains outstanding, the Company will not, without the consent of the holders of two-thirds of the Preferred Stock outstanding, create any mortgage debt or other obligation which would be entitled to payment out of the assets of the corporation prior to the Preferred Stock, excepting only such obligations as may be incurred in the ordinary and usual course of business, not secured by a lien upon the Company's property, and excepting also purchase money obligations given in connection with the acquisition of new property, nor shall the Company, without such consent, create any other issue of stock which shall in any way impair the rights of the holders of the present issue of Preferred Stock.

"No dividends shall be declared or paid on the Common Stock until the current quarterly dividend on the Preferred Stock, as well as all accumulated or defaulted dividends thereon, shall have been either paid or set aside.

"In the event of bankruptcy, insolvency, voluntary or involuntary dissolution of the Company, holders of Preferred Stock shall be entitled to receive in distribution of the assets, $100. a share and all accumulated, unpaid and accrued dividends thereon before any sum shall be paid to or any assets distributed among the holders of the Common Stock * * *."

These pertinent features of the resolution above are set forth on the back of the stock certificate of the Curtis Publishing Company and form a part of the contract between the company and the individual stockholders.

Sometime in November, 1939, the directors proposed to the stockholders of the company a plan of reorganization which was destined to reduce the dividend requirement on the preferred stock of the company. The plan, being opposed by a large number of preferred stockholders, was abandoned. On April 19, 1940, the board of directors of the defendant company adopted a plan of reorganization and recapitalization and submitted the same to the stockholders meeting on the 2nd day of July, 1940. At that meeting, 12,131 stockholders were entitled to vote 722,420 shares of preferred stock, and of these shares approximately 72% were voted in favor of the plan and approximately 4% against the plan and approximately 24% were not represented at the meeting nor voted. Of the shares voting, approximately 95% voted in favor of the plan and 5% voted against the plan. Approximately 92% of the shares owned by holders solely of the preferred stock of the defendant company which voted on the plan, voted for the plan and approximately 8% voted against the plan. Approximately 25% of the shares which did not elect to exchange under the plan voted for the plan. The amendment of the articles of incorporation of the Company were accordingly filed with the Secretary of the Commonwealth on July 17, 1940, and on August 15, 1940, the plan was declared operative.

Under the proposed plan of reorganization and recapitalization, the preferred shareholders were asked to surrender their present preferred shares for cancellation, including the dividends accrued thereon which as of July 1, 1940, amounted to $20.12½ per share and were offered in exchange the following new securities for each share of preferred so surrendered: A $10 share in a debenture, the principal amount of which is $7,224,200 payable in fifteen years and yielding 3%, with the provision for a sinking fund of $250,000 per year for its retirement; one share of prior preferred stock carrying fixed cumulative dividends of $3 per year, and an additional dividend of $1 a year payable and cumulative to the extent earned, having a call price of $75 a share and a value of $65 per share in liquidation, with an equal voting right with the common stock and with the additional right if six quarterly fixed dividends are in arrears to elect two directors until all arrearages are paid up

and two and one-half shares of common stock. The old common stock of 1,733,041 shares was increased by 1,806,050 shares under the plan, making a total of 3,539,091 shares of common stock. In the event a holder of $7 cumulative preferred stock did not wish to exchange under the plan, he could retain his shares with his right to a dividend of $7 on them as well as the accumulated dividends, subordinate however in priority to the $10 debenture and the $3 or $4 (as the earnings might warrant) of the new prior preferred stock but payable before any dividend could be payable on any of the common stock.

To make provision for the issuance of the debenture the stated capital of the defendant company of $30,000,000 was reduced to $22,755,800 by the transfer of $7,224,200 to surplus against which the debentures were charged as issued. The plan also provided for the cancellation of 177,580 shares of preferred and 66,959 shares of common stock held by the company. On the basis of a 100% exchange, the original preferred stockholders would have become owner of approximately 51% of the common stock and since the new prior preferred and the common stock carry full voting rights, the original preferred stockholders would have had well over 50% of the total voting power and on the basis of the actual exchange the old preferred stockholders have more than 50% of the total voting power.

The question here involved is whether the plan calling for the exchange of one share of the preferred stock for a $10 debenture plus one share of prior preferred $3 cumulative, $4 payable and cumulative if earned, callable at $75 per share and having a value in liquidation of $65 a share, plus 2½ shares of common stock with the right in the preferred shareholder to retain his $7 cumulative preferred stock, callable at $120 per share and having a value in liquidation of $100 a share but held subordinate to the debenture and the prior preferred stock, both as to the $7.00 future dividend as well as the accumulated dividend thereon, is a valid one.

█ No question is here raised by counsel for the complainant that the resolution of the stockholders in meeting of December 16, 1925, in any way conflicts with or is violative of the statutory requirements or the constitutional provisions with respect to corporations in Pennsylvania. It cannot be doubted that the resolution became not only part of the contract between the corporation and preferred shareholders, and this is particularly true here because the terms of the resolution are printed on the reverse side of the preferred stock certificate itself, but also was a contract amongst the stockholders inter sese 2 Cook on Corporations, 5th Ed., § 419.

Therefore in order to test the validity of the plan, it is necessary among other things to consider the terms of the contract, the conditions and limitations embodied in it and the character of the rights flowing from it. It may be stated at the outset that if there is any compulsion to make the change provided for under the plan, it arises from the impairment of the value of the preferred stock and not from any express provision in the plan. One of the pertinent provisions of the contract is that particular section which provides that without the consent of two-thirds of the preferred stock outstanding, the company may not create any other issue of stock "which shall in any way impair the rights of the holders of the present issue of preferred stock". As set forth above more than the necessary two-thirds of the preferred stock outstanding voted for the plan and our question then is whether the change wrought in the status of the preferred shareholders rights is within the scope of the contract, and if it is, was the exchange optional, was it a voluntary exchange, or was the choice given such a harsh one, as to really render it compulsory?

The question here posed finds no answer in any decided case in the State of Pennsylvania nor in the Supreme Court of the United States and so resort must be had to the few states in which plans some wise similar to this have been construed by the courts.

Two cases which have arisen in the State of Delaware, Keller et al. v. Wilson & Co., Del.Sup., 190 A. 115, and Consolidated Film Industries, Inc., v. Johnson, Del.Sup., 197 A. 489, 493, hold that by an amendment to its corporate charter, a Delaware corporation cannot eliminate accrued cumulative dividends on preferred stock without the consent of the holders so as to permit the payment of dividends on the common stock before the cumulative dividends accrued at the time of the amendment were paid on the preferred stock. In the Consolidated Film Industries, Inc., case supra, the proposed amendment sought to convert 400,000 shares of participating preferred stock entitled to cumulative divi-

dends at the rate of $2 a share into 500,000 shares of preference stock entitled to cumulative dividends at the rate of $1 per share and to exchange each share of the old preferred stock for 1¼ shares of the new preferred stock and ¼ share of the common stock and to cancel all right to accumulated and unpaid dividends on the old preferred shares, and inter alia whenever the accumulated fixed dividends on the preference stock have been declared and paid or set apart for payment the board of directors could declare additional dividends out of any remaining surplus and/or net profits providing one half of the aggregate amount of such dividend be payable to the holders of preferred stock as a class and the remaining one half thereof be payable to the common stock as a class. Whereas under the old preferred stock when all the dividends on it had been declared and paid or set aside for payment, the directors might declare dividends on the common stock not to exceed $2 per share and after the payment of $2 per share on the common stock in any year any remaining surplus or net profits remaining were payable to the holders of the preferred and common stock, share for share, as if all shares were of the same class. When the corporation was organized the amendment to the general corporate law of Delaware of March 2, 1927, 35 Del.Laws, c. 85, § 10, was in existence which authorized amendments to certificates of incorporation "by increasing or decreasing its authorized capital stock or reclassifying the same, by changing the number, par value, designations, preferences, or relative, participating, optional, or other special rights of the shares, or the qualifications, limitations or restrictions of such rights". The court enjoined the filing of the amendment with the Secretary of State holding that while the complainant was bound "to know that the language of the amendment of 1927 was broad enough to permit the corporation to change the character of the stock in which he was willing to invest his money, into a stock of another kind in which, perhaps, he would not invest, and he assumed the risk of the exercise of the power of amendment by the corporation. But, the statute informed him that the corporation was granted a power only. He was not informed that the exercise of the power not only would change the character of his stock and the rights incident thereto in the future, but also, by retrospection, would cancel his fixed, contractual right to dividends accrued through time, and which, as against common shareholders, he was entitled by virtue of his contract to have paid before distribution of earnings among them." In substance this case follows Keller v. Wilson & Co., supra, the only difference being that in that case the corporation was formed before the amendment of 1927 was enacted. However, it is to be noted that in both these cases accrued dividends which had accumulated on the preferred stock were eliminated under the plan. Further the court in speaking of the Keller case held that "In either case, as concerns the amendment of 1927, the owner of cumulative preferred shares, was entitled to rely on his contractual right which, as against common shareholders, entitled him to receive at some time the dividends accrued thereon through time until the accomplishment of the reclassification of the shares and the change of their status by the necessary corporate action under the power granted". It is therefore definitely decided in both the Keller and Consolidated Film cases, supra, that the rights accruing to a holder of preferred stock upon which dividends have accumulated cannot be eliminated entirely in favor of the common stockholders under the statutory laws of Delaware. Counsel have laid a great deal of stress on both these cases and in fact the complainant in the Consolidated Film Industries case is the same Johnson as the complainant in the instant case, and yet it is submitted they are not applicable in the instant case as there is (1) no attempt to eliminate the dividends accumulated on the preferred stock and (2) there is no attempt here to provide for the payment of the dividends to common stockholders before the dividends accumulated on the preferred shares are paid. The complainant further cites Roberts v. Robert-Wicks Company, 184 N.Y. 257, 77 N.E. 13, 3 L.R.A.,N.S., 1034, 112 Am.St. Rep. 607, 6 Ann.Cas. 213, where the holder of 250 shares of 6% cumulative preferred stock by reason of the company reducing its authorized capital stock because of impairment of capital, held after the reduction only 166 shares of the preferred stock. Before the reduction dividends had accumulated on the 250 shares for four years, after the reduction of its capital, the company declared a dividend on the preferred stock and 1% on the common, and the complainant contends that no dividends could be paid on the common

stock until the arrearages on the preferred stock held prior to the reduction were paid. This the court held the company was bound to do. Here as in the Delaware cases cited above the company attempted to eliminate accrued dividends as well as to make a payment out of the net income on the common stock before paying a dividend on the old preferred, which had an accumulated dividend thereon. Counsel further cites the case of Pronick v. Spirits Dist. Co., 58 N.J.Eq. 97, 42 A. 586, 588, which holds that under a general clause permitting any corporation to "amend its original certificate" a corporation could not reduce the rate of dividend to which the preferred stock was entitled under the term of its issue. Here the court held the provision was too general to permit of the reduction of the dividend, saying, "such alteration would impair the obligation of the contract created by the stock certificate issued under the company's charter". This case, it is submitted, has not the same factual basis as the instant case and any attempt to draw a definite conclusion from the ruling of the court which might act as a guide in our case would be in no wise helpful, for in the instant case, the stock certificate itself issued under the company's charter made definite provision for a change in the rights of the holders of the preferred stock.

In Lonsdale Securities Corporation v. International Mercantile Marine Co., 101 N.J.Eq. 554, 139 A. 50, relied upon by the complainant, the court held that the certificate of incorporation could not be amended so as to permit the exchange of preferred stock for preferred and common stock where the contemplated exchange, if carried out, would divest the preferred stockholders of their rights in accumulated dividends. Here, as in the other cases, was an attempt to eliminate the dividends accumulated on the cumulative preferred stock and to make payment to common stockholders of a dividend to which the shareholders of the accrued dividend would have been entitled. In Patterson v. Durham Hosiery Mills et al., 214 N.C. 806, 200 S.E. 906, and in Patterson v. Mills et al., 216 N.C. 728, 6 S.E.2d 531, the analogy is more comparable to our own situation. Here the court held that the holders of cumulative preferred stock upon which dividends had accrued could not be divested of their property right to them, by the corporation paying a dividend on new preferred stock exchanged

for the old, before the payment of the accumulated dividend on the old preferred stock. The court held that the plan as there presented did not offer the complainant a free choice, and as a result was not a voluntary one.

However, I am constrained to hold that the plan here was one permissible under the contract with the complainant and the corporation and did not violate the contract with the shareholders inter sese, and to further hold that the plan was a voluntary one and not a compulsory one. As has been stated before the condition of the company from and including the years 1933 to 1939 with its net earnings failing to pay the $7 dividend in full causing year after year an accumulation on its preferred stock which amounted on October 1, 1940, to $21.12½ without any dividends having been paid on the common stock, presented, to say the least, a top heavy structure in the company's financial set up and which from a practical standpoint the preferred shareholders had indeed only an extremely remote hope of benefiting from. It has been stressed by counsel for the complainant that there was a $20,000,000 surplus available from which the company might have paid the accrued dividends. But as was testified to, this $20,000,000 was really a bookkeeping surplus in that the total assets of the company were far less than the amount of the preferred stock taken at its liquidation value, and accordingly the existence of a surplus as set up, under these circumstances was only done by carrying the preferred stock at a much lower stated value than its liquidating value. Again since dividends are payable in cash counsel contends that the sum of $14,500,000 which was the amount of dividends which had accrued as of July 1, 1940, on the preferred stock might have been paid out of cash which the balance sheet showed amounted to $8,690,432.39 as of December 31, 1939, and out of marketable securities of $9,201,393.35, which total about $17,900,000. However, the conduct of the board of directors is not to be criticized by their failure to so deplete their cash and marketable securities as to leave less than a $3,500,000 working capital, which would result from the payment of the accumulated dividends out of these funds. It would seem that for the board to have so done, would have been most inadvisable, taking into consideration the size of this company and the working capital necessary for its proper

functioning. Much has been made by counsel for the complainant of the conduct of the defendant company in spending more than $5,000,000 from 1933 to 1939 in the purchase of their preferred and common stock, most of which was done in the last two or three years. However, this was done as testified to by the treasurer of the company because of the difficulty in securing sound investments, and by the purchase of preferred stock especially, there was a benefit to the company by the elimination of the claim to future dividends of $7, of back dividends, as well as to the right of liquidation at $100 per share. There were also purchases of common stock by the company, in some instances repurchases from employees who had purchased the stock from the company, but the amounts involved are not sufficient to be in any wise controlling even if it be admitted that the purchase thereof was of no benefit to the corporation. The main objection to the plan, the complainant urged, is that it resulted in a benefit to the old common stockholders and a number of instances were placed in the record in alleged substantiation thereof. Take an instance that counsel for the complainant cites where $2,383,000 is earned by the company. Before the recapitalization plan, assuming the entire earnings were declared in dividends, $2,383,000 would go to the old preferred stockholders and there would be accumulated dividends running to their benefit of $2,600,000; after the plan goes into effect, assuming a 100% exchange, all of the $2,383,000 would be taken up by the debenture and $3 being paid on the prior preferred shares, and actually nothing left over for the common stockholders. Therefore, in neither instance, assuming this earning and a 100% exchange, would the common stockholders get anything, but counsel argued the old common stockholders are potentially better off because if we deduct from this $2,600,000 fifty-one percent (51%) thereof, which would go to the preferred stockholders under the plan, there would remain $1,300,000, and to this extent the common stockholders would be benefited by not having this accumulated ahead of their common stock.

Similarly it is urged that before recapitalization $47,000,000 would have to have been realized in assets before the common stockholders would get anything in liquidation, and after recapitalization only $15,-000,000 in assets would have to be realized before the common stockholders get anything, and that therefore under the plan the common stockholders would fare better by not having to realize $32,000,000 in assets. However, taking into consideration both these contentions of the complainant, the common stockholders get nothing in either case, for as has been indicated in the first instance there is nothing available actually for the common stockholders either before or after the plan as the earnings per share do not cover the $7 requirement on the preferred before the plan and under the plan after the payment of $3 per share on the prior preferred and the interest on the debentures, there is nothing left for the common stock. In the latter case there is nothing available on liquidation for the common stockholders before or after the plan, for in either instance there would be insufficient assets to provide for the respective values giving the liquidating values for the stock. Accordingly, while it may seem that under certain hypothetical circumstances the old common stockholders may be potentially better off under the plan than they were before, one must be realistic and view the plan in its practical aspect as it affects all classes of shareholders and to indulge in benefits remote from actuality would seem to serve no useful purpose.

It is to be borne in mind that the plan does not purport to extinguish any of the rights of the preferred stock nor to require that stock be converted into any other stock, nor to require its exchange for anything in substitution. So that for all that the plan provides the complainant may continue to hold his shares and the only alteration in his rights will be the consequence of the issuance of the prior preferred stock and the debentures, and accordingly I hold that the better view is that adopted by the Courts of Ohio in Johnson et al. v. Lamprecht, 133 Ohio St. 567, 15 N.E.2d 127, August 9, 1940, and of Delaware in Shanik v. White Sewing Machine Corp., Del.Ch., 15 A.2d 169, the rationale of which is, that where preferred stock issued by a corporation entitles its holders to accumulated dividends and dividends have accumulated on the stock so held, and where the corporate charter conferred on the holders of preferred stock the right to exact that common stockholders should not receive dividends or distributions in liquidation of capital until dividends at the stated rate had been paid to the preferred stockholders, the payment of

dividends on a new prior preferred stock subsequently issued did not destroy the right of old preferred stockholders of accumulated dividends, and therefore payment of dividends on the new prior preferred stock could not be enjoined. In other words, in these cases the courts have stated that the right which the preferred stockholder has conferred upon him is as in the instant case, the right to exact that the common stockholders shall not receive dividends until dividends are paid to the preferred stockholders. It is unnecessary in our view of the case to decide whether or not the dividends on preferred shares of stock which accrued through lapse of time are "vested rights of property" or "fixed contractual rights" as these phrases have been used in the Keller and Johnson cases, supra, since there is no intention under this plan to divest the preferred stockholders of his right to accumulated dividends but at most to defer them. Moreover, none of the cases dealing with this subject hold that language such as is contained in the plan herein or of the amendment to the articles of incorporation of the defendant company should be construed to express or imply that accumulated dividends will not be paid nor does it on the other hand permit the inference that the corporation will not make changes in its capital structure as a consequence of which the probability of actual payment of dividends may be postponed. The case which has been cited subsequently with approval, and which makes a thorough review of the law with respect to the rights of the holders of preferred stock on which dividends have accumulated, is that of Morris et al. v. American Public Utilities Co., 14 Del.Ch. 136, 122 A. 696, 705. The court held here as in the later Delaware cases that accumulated dividends on preferred stock could not be entirely eliminated by an amendment to the articles of incorporation, to that effect. However, of particular interest is that portion of the Court's opinion in which it denies one of the prayers of the bill which sought an injunction against a payment of dividend on a newly created class of preferred stock until the accumulated dividends on the old stock were paid. This the court states "they are not entitled to for the reason that by the terms of the original certificate authorizing the preferred stock, whatever preference it has can be before dividends on common stock only. The corporation has neither declared not set apart

from their earnings, any sum for a dividend on the common stock, nor is it threatening to do so. The payment of dividends to the two preferred classes created by the amendment which come in ahead of the class which the complainants hold is not in violation of the rights secured by them by their contract with the corporation and the injunction should, therefore, not issue as prayed". This, it is submitted, is the same situation as presented by the plan and is therefore in complete accord with the ruling of the court here. The same is true in Ainsworth v. Southwestern Drug Corp., 5 Cir., 95 F.2d 172, and to the same effect Lou W. Kreicker v. Naylor Pipe Co., 1940, 374 Ill. 364, 29 N.E.2d 502, where the court sustained the view of Johnson v. Lamprecht, supra.

It is impossible for me to enter into any further examination of the legality of the plan adopted because of the limit of time if this matter is to be decided, before a failure to decide, will amount to an injustice. It seems to me, however, that the preferred stock under the contract only had preference over the common stock, and it was not provided that it was to be free from the burden of the preferences of other classes of stock which might be created. It was senior among the class of stock which was then authorized under the contract with the stockholders. It is now junior to two new classes. What has occurred therefore is that the preference which it had originally enjoyed has been changed or altered, not however in relation to the common stock, for the preference over it is in no wise effected. However, in relation to earnings and assets, it stands no longer first but third. However, no valid objection can be raised to this since this was a condition upon which the complainant as a preferred stockholder purchased his shares.

In spite of the deferment of their position, the approximately ten percent (10%) who did not exchange under the plan, are in a rather favorable position. If we consider the earnings for and including the year 1932 and down to and including 1939, and if their position was as it is today, there would be only three years in those nine in which very substantial dividends would not be available for them. Moreover, if the past record of the company is any criterion of its future dividend policy—since in these years all that was earned by it was paid out in dividends—they have

752

little cause for complaint. If we take the average earnings for these nine years—Mr. Reis, a witness for the complainant, insisted that 1939 alone would show a better picture—they would amount to $4,170,-000, and if we deduct from this average earning the amounts necessary to take care of 90% of the debenture and prior preferred stock, there would be left available for payment on the remaining 10% of the preferred shares about enough to wipe out the arrearages presently existing on them.

Accordingly, I find that the plan is a valid one and is in no wise violative of the rights of the complainant as a preferred stockholder. In this view of the case there is no necessity for going into the question of laches presented. The prayer of the bill is denied and judgment entered for the defendant.